UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JOSEPH M. SALVANI and JFS INVESTMENTS, :
INC.,                                     :
                                          :
                    Plaintiffs,           :
                                          :
        - against -                       :          **OPINION AND ORDER**
                                          :           13 Civ. 7082 (ER)
ADVFN PLC, a company incorporated under the :
laws of the United Kingdom,               :
INVESTORSHUB.COM, INC., and JOHN DOE,     :
known herein as "brkylnrusso,"            :
                                          :
                    Defendants.           :
-------------------------------------------------------------x

Ramos, D.J.:

        This case arises out of allegedly defamatory statements made on an online message board

that caters to members of the securities industry.   Plaintiffs Joseph M. Salvani and JFS

Investments (together, "Plaintiffs") allege that Defendant John Doe ("Doe") made untrue

statements regarding Plaintiffs' business on Defendant InvestorsHub.com, Inc.'s

("InvestorsHub") website.   Defendant Doe allegedly accused Salvani of orchestrating a pump

and dump scheme by artificially inflating certain stocks and selling them in order to profit at the

inflated prices.   According to Plaintiffs, this post damaged Plaintiffs' business and caused stock

held by them to decline.

        Plaintiffs bring suit against Defendant Doe, InvestorsHub, and ADVFN PLC

("ADVFN"), the company that controls InvestorsHub.   On October 4, 2013, Plaintiffs filed their

original complaint, alleging federal question jurisdiction but bringing claims only under state

law.   Doc. 1.   Plaintiffs filed the Amended Complaint on December 10, 2013, adding claims

under Sections 10(b)[1] and 9(a)(4) of the Securities Exchange Act of 1934 ("Exchange Act") and two additional state law claims not included in the original complaint.  Doc. 7.  On February 18, 2014, Plaintiffs filed the Second Amended Complaint ("SAC"), alleging the two federal securities law claims as well as the following six claims under state law:  (i) defamation; (ii) libel; (iii) tortious interference with contract; (iv) aiding and abetting; (v) intentional infliction of emotional distress; and (vi) a permanent injunction for the removal of the allegedly defamatory post.

Presently before the Court is Defendant InvestorsHub's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. Doc. 18.  Defendant contends that Plaintiffs' Exchange Act claims are not colorable and that there is therefore no basis for this Court's jurisdiction.   For the reasons discussed below, Defendant's motion to dismiss pursuant to Rule 12(b)(1) is DENIED, however, the Court dismisses the SAC *sua sponte* pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[2]

---

[1] The claim under Section 10(b) of the Securities Exchange Act is also brought under Securities and Exchange Commission Rule 10b-5 ("Rule 10b-5"), which was promulgated under Section 10(b).  For the purposes of the instant decision, the Court will refer to the claim as arising under Section 10(b).

[2] Defendant ADVFN and Defendant Doe have not yet been served.  However, because Plaintiffs' claims against those defendants suffer from the same deficiencies as against InvestorsHub, the Court will treat the instant motion as if it were brought on behalf of all defendants.  *Cf. Hamilton v. Broomfield*, No. 95 Civ. 3241 (MBM), 1998 WL 17697, at *1n.1 (S.D.N.Y. Jan. 20, 1998) (dismissing claims against unserved defendant because they were identical to claims against defendant who filed the motion to dismiss); *Johnson v. New York City*, No. 12 Civ. 4379 (KBF), 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013), *aff'd*, 551 F. App'x 14 (2d Cir. 2014) (dismissing claims *sua sponte* against defendant who had not been served); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023 (LAK), 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001) (dismissing complaint against defendant who had not been served because the complaint was deficient against this defendant for "precisely the same" reasons).

## I.   Factual Background

The following facts are based on the allegations in the Second Amended Complaint, which the Court accepts as true for purposes of the instant motion.  *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 607 (S.D.N.Y. 2007).

Salvani has worked as an investment advisor through his company JFS Investments Inc. for over 25 years.  SAC ¶ 20.  Until September 5, 2013, Salvani was party to a written consulting agreement with CodeSmart Holdings, Inc. (stock symbol "ITEN"),[3] whereby Salvani advised CodeSmart in its dealings with institutions and retail investors.  *Id.* ¶ 22.  Salvani received cash and CodeSmart securities under the contract.  *Id.* ¶ 23.  The value of the contract was in excess of $3 million.  *Id.* at ¶ 22.

InvestorsHub is a content provider operating under the control of ADVFN.  *Id.* ¶ 28. ADVFN generates revenues from InvestorsHub through the solicitation of paid memberships throughout the United States.  *Id.* ¶ 29.  Membership consists of approximately 250,000 accounts, including traders and other securities professionals.  *Id.*  InvestorsHub provides a forum for members to post messages seeking public review and comment.  *Id.*  According to InvestorsHub, the site is intended as a "forum for serious investors to gather and share market insights in a dynamic environment using an advanced discussion platform."  *Id.*

Only subscription members of InvestorsHub who have accepted the website's "Terms of Service" may post on its message boards.  *Id.* ¶ 31.  The Terms of Service require that members refrain from uploading, sharing, posting, or otherwise distributing or facilitating distribution of any content that is, *inter alia*, "unlawful, threatening, abusive, harassing, defamatory, libelous, vulgar, hateful, deceptive, fraudulent, invasive of another's privacy, [or] tortious . . . ."  *Id.* ¶ 32.

---

[3] CodeSmart trades in the Over-the-Counter Bulletin Board market.  SAC ¶ 54.

However, InvestorsHub is not obligated by its Terms of Service to remove any content that does not comply with the Terms or other rules of conduct for the site, or that is "otherwise harmful, objectionable, or inaccurate, or clearly detracts from the value of the community, as determined in [its] sole judgment . . . ." *Id.* ¶ 33.  InvestorsHub is aware of policy violations by members but does not disclaim the accuracy of such posts or otherwise advise the public that the posts are not "adopted" by the site.  *Id.* ¶ 35.  Instead, InvestorsHub claims that it is "not responsible for any failure or delay in removing such Content," and only removes content if it chooses to do so.  *Id.* ¶ 36.

InvestorsHub uses moderators to screen posts in order to remove what it decides to be offensive conduct.  *Id.* ¶ 63.  InvestorsHub's User and Moderator Handbook states that the moderators "promote the civil exchange of on-topic dialog that complies with the iHub's Terms of Service" and "help foster an environment that promotes and encourages posting of ALL opinions and information about companies, regardless of the bullish or bearish sentiment of the posts, and to be the site's first line of defense in ensuring [it] remain[s] free of spam, vulgarity, and personal attacks."  *Id.* ¶¶ 64, 65 (emphasis omitted).  There are more than 17,000 active boards on the InvestorsHub site, of which approximately 6,800 have at least one moderator.  *Id.* ¶¶ 67-68.  Over 4,300 InvestorsHub members volunteer as moderators on one or more boards. *Id.* ¶ 68.

According to the SAC, InvestorsHub has encouraged, developed, and created a "lawless no-man's land" through the adoption of content-specific banners, such as "Most Shady OTC/PK CEO's (CROOK)," "Fighting the Crooked CEO[s] and /or the MM's that HELP THEM," "Crooks, Frauds, Liars, and Banksters," and "Crooked's Den of Self Actualization."  *Id.* ¶ 70. These banners intentionally invite comment, and, according to Plaintiffs, are intended to "expose

the targeted individuals to hatred, contempt, ridicule and obloquy." *Id.* ¶¶ 61, 70. The banners are published without disclaimers. *Id.* ¶ 61. According to Plaintiffs, all InvestorsHub members are on notice that the provider is under no obligation to remove posts—no matter the content— and agree that the site will be immune from liability. *Id.* ¶ 71.

The alleged unlawfulness of the InvestorsHub posts has increased user activity, which has encouraged national financial institutions to advertise on the site. *Id.* ¶ 74. These advertisements increase awareness about InvestorsHub and generate additional income for the site. *Id.*

### The Post by brklynrusso

On September 5, 2013, Defendant Doe (operating under the InvestorsHub screenname "brklynrusso") posted the following message to a forum entitled "CodeSmart Holdings, Inc. (ITEN)":[4]

> salvani was a former broker barred from the financial industry. He now gets "consulting" jobs with OTC bulliten board co's that have no other means to raise money so he goes out w/ his cronies(brokers he knows)that promote the stock. How he gets paid? The brokers are given restricted stock which they subsequently sell he gets paid off with cash in a bag. The stock usually collapses w/ little value once they have exited. Just google Joe Salvani:
>
> http://www.forbes.com/forbes/1998/0504/6109174s1.html   he works with this group out on LI and a broker Daniel welsh or walsh from garden state securities who also get stock in all of salvanis deals. they get stock as an advisor for pretty much doing nothing….its a total joke and im shocked the sec hasn't knocked on their door yet.
>
> as for ITEM, 35k rev losing 2mil ayr w/ a 50mil mkt cap….you tell me if this is a real px at 4? pump n dump at its best

SAC ¶ 38 (emphasis omitted).

---

[4] The Court has reproduced Doe's post from the Second Amended Complaint without alteration.

Defendant Doe was, and may still be, a paying member of InvestorsHub and an investor in CodeSmart.  *Id.* ¶ 39.  Plaintiffs allege that Doe posted the comments with the intention of injuring Plaintiff Salvani and manipulating CodeSmart's stock price, and that Doe knew that his post would be published by InvestorsHub and read by traders and other securities professionals.  *Id.* ¶¶ 39, 40.  InvestorsHub disseminated Doe's post without disclaimer, and with the knowledge that it would be read by traders and other securities professionals to have this effect.  *Id.* ¶ 41.

Plaintiffs assert that Doe's statements were known to be false when made.  *Id.* ¶ 43.  First, Salvani has not been barred by the financial industry, and there are no orders or judgments against Salvani or JFS Investments issued by the U.S. Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any court of competent jurisdiction.  *Id.* ¶¶ 52, 53.  Second, Salvani is not involved in a pump and dump scheme involving "brokers he knows."  *Id.* ¶ 54.  Salvani is not, and has never claimed to be, a broker.  *Id.* ¶ 55.  He did not participate in any of the illegal activity alleged in Doe's post.  *Id.*

Doe's post has appeared on InvestorsHub since September 5, 2013, and rapidly spread across Wall Street through media and subscriber-based news services.  *Id.* ¶¶ 42, 56.

On September 5, 2013, Salvani discovered Doe's post and made a written demand to InvestorsHub for its removal.  *Id.* ¶ 57.  Salvani informed the site that the comments were unlawful and defamatory. *Id.*  On September 9, 2013, David Lawrence, InvestorsHub's webmaster, responded to Salvani's demand, refusing to remove the post

and citing InvestorsHub's right "not to make value judgments on the veracity" of its members' comments. *Id.* ¶ 58.

As a result of Doe's post, Salvani alleges that the good reputation he has enjoyed during his 25-year career, both generally and in the financial community at large, has been damaged. *Id.* ¶¶ 20, 24.  Doe's post has also had a direct effect on JFS Investments' ability to participate and perform under the contract with CodeSmart, as well as on other contracts. *Id.* ¶ 76.

On August 30, 2013, shortly before the publication of Doe's statements, CodeSmart stock "began to trade in unanticipated and unexplained volumes experiencing trading at losses and evincing signs of stock manipulation." *Id.* ¶ 46.  On August 30, 2013, the stock traded at $4.60 per share. *Id.* ¶ 47.  The stock then declined from a price of $3.97 per share on September 6, 2013 to $3.05 on September 10, 2013. *Id.*  The stock price continued to decline, reaching $2.13 per share on September 20, 2013, and $1.82 on November 12, 2013. *Id.* ¶ 48.  According to Plaintiffs, these stock declines were caused by Doe's comments. *Id.* ¶ 49.

Salvani traded his shares at some point during this period of decline. *Id.*

## II.   Discussion

Defendant brings the instant motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction.  Rule 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008),

7

*aff'd*, 561 U.S. 247 (2010) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, evidence outside of the pleadings, such as affidavits, may be considered by the court to resolve the disputed jurisdictional fact issues.  *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000); *see also Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true, but does not draw inferences from the complaint favorable to the plaintiff.  *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004), *cert. denied*, 544 U.S. 968 (2005) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998)).

Unlike a dismissal under Rule 12(b)(6), a dismissal under Rule 12(b)(1) is not reflective of the merits of an action.  *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 470 (S.D.N.Y. 2004), *aff'd*, 166 F. App'x 559 (2d Cir. 2006) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  As the Second Circuit has noted, "in cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action, we ask only whether—on its face—the complaint is drawn so as to seek recovery under federal law or the Constitution."  *Nowak*, 81 F.3d at 1189.  Indeed, in such cases, "the claim should not be dismissed for want of jurisdiction except when it 'appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'"  *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 152-53 (2d Cir. 1984) (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)); *see also Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("No doubt if it should appear that the plaintiff was not really relying upon [a federal statute] for his alleged rights, or if the claim of right were

8

frivolous, the case might be dismissed."). The question on a Rule 12(b)(1) motion "is whether the federal . . . claim [is] so insubstantial, implausible, . . . or otherwise completely devoid of merit as not to involve a federal controversy." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993), *cert. denied*, 513 U.S. 822 (1994).

Here, Defendant InvestorsHub argues that Plaintiffs' Exchange Act claims are not colorable and that the Court therefore lacks subject matter jurisdiction over them. Def. Mem. L. 4. Specifically, Defendant contends that Plaintiffs have failed to plead two necessary elements of a claim under Section 10(b) of the Exchange Act: reliance and loss causation. *Id.* at 5. Defendant further argues that the claim under Section 9(a)(4) of the Act necessarily fails because Plaintiffs have failed to plead a colorable 10(b) claim. *Id.* at 11. Moreover, according to Defendant, Plaintiff has also failed to allege that a defendant sold or offered to sell CodeSmart securities, as required by Section 9(a)(4). *Id.*

On a motion to dismiss for lack of subject matter jurisdiction, the Court must simply consider whether the federal claims are wholly insubstantial and frivolous. *See AVC Nederland*, 740 F.2d at 153. Plaintiffs here have grounded their allegations in the elements of their federal causes of action, Sections 10(b) and 9(a)(4) of the Act, SAC ¶¶ 77-84.[5] For example, Plaintiffs

---

[5] To succeed on a claim under Section 10(b), a plaintiff must adequately plead (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See, e.g.*, *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 347-48 (S.D.N.Y. 2011). Section 9(a)(4) similarly prohibits the use of a false or misleading statement in connection with the purchase or sale of a security and has "parallel requirements" to Section 10(b). *Panfil v. ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991). In *OpenGate Capital Group LLC v. Thermo Fisher Scientific Inc.*, No. 13-1475-GMS, 2014 WL 3367675, at *9 (D. Del. Jul. 8, 2014), the court noted the "little judicial interpretation of the pleading requirements of Section 9" and concluded that the following elements are required for a Section 9(a)(4) claim: (1) a material misrepresentation; (2) scienter; (3) intent to induce reliance; (4) reliance upon the misrepresentation; and (5) the plaintiff's act in detrimental reliance on the misrepresentation.

have tracked the language of the Act in crafting the allegations in the SAC.  Specifically, with

respect to the Section 10(b) claim, Plaintiffs contend that:

> brklynrusso, and Investorshub.com by engaging in the conduct described above,
> directly or indirectly, by use of and the means and/or instrumentality of interstate
> commerce, and the wire facilities, the facilities of the national securities exchange
> network, in connection with the purchase and/or sale of securities:
>
> (a)  with scienter, employed [] devices, schemes, or artifices to defraud,
>
> (b)  made untrue statements of material facts or omitted to state material facts
> necessary in order to make the statements made, in the light of the circumstances
> under which they were made, not misleading, or
>
> (c)  engaged in acts, practices, or courses of business which operate or would operate
> as a fraud or deceit upon any person.

*Id.* ¶ 78; *see* Rule 10b-5.  Plaintiffs similarly apply the language of the Act in their Section

9(a)(4) allegations:

> By engaging in the conduct described above, brklynrusso, directly or indirectly, by
> the use of the wires and means or instrumentality of interstate commerce, and the
> facility of national securities exchange, or for any member of a national securities
> exchange, engaged in selling or offering for sale or purchasing or offering to purchase
> the ITEN securities owned by Salvani, made, regarding said security registered on a
> national securities exchange, did for the purpose of inducing the purchase or sale of
> ITEN securities, made statements which were at the time and in light of the
> circumstances under which they were made, false or misleading with respect to
> material facts, and which he knew or had reasonable grounds to believe were so false
> or misleading and intended to manipulate the market price and ownership interest of
> Salvani.

SAC ¶ 82; *see* Section 9(a)(4).

Furthermore, Plaintiffs assert a theory of liability that comes within the ambit of the

Exchange Act claims.  First, the SAC is premised on allegations that Defendants made or

published false and misleading statements relating to CodeSmart.  Plaintiffs claim that Defendant

Doe made the statements with scienter, knowing that they were false and misleading and would

cause injury to Plaintiffs.  The SAC further alleges that these false statements caused the price of

CodeSmart stock to drop, which resulted in losses to Plaintiffs.  Accordingly, whether or not Plaintiffs can ultimately prevail on their federal causes of action, the Exchange Act claims are "drawn so as to seek recovery under federal law." *Nowak*, 81 F.3d at 1189.

In the face of similar allegations, courts have consistently rejected challenges to federal securities claims under 12(b)(1).  *See, e.g.*, *AVC Nederland*, 740 F.2d at 152 ("There is no occasion to consider, on this motion under [Rule] 12(b)(1), defendants' argument that the interest in Atrium that was offered by AVC was not a 'security' within § 3(a)(10) of the Securities Exchange Act and that the district court lacked subject-matter jurisdiction on that account"); *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999) ("[T]he main issue arising from the pleadings is whether the Pace interests and the Weyland Eagle interests are 'securities' under federal securities laws. . . . To the extent [the] Complaint raises [this] question[], it is neither 'plainly insubstantial' nor does it fail to present any issue worthy of adjudication."); *S.E.C. v. Norton*, No. 95 Civ. 4451 (SHS), 1997 WL 611556, at *2 (S.D.N.Y. Oct. 3, 1997) (denying Rule 12(b)(1) motion and proceeding to determine Rule 12(b)(6) motion because the issue of whether the complaint failed to allege an offer or sale of a security involved "elements [that were] integral to plaintiff's ability to state a claim" for securities fraud); *see also Williamson v. Tucker*, 645 F.2d 404, 416 (5th Cir. 1981) ("We have already specifically held that the definition of the term 'security' in the context of a suit based on the federal securities laws may reach the merits of the case and thereby limit the court's discretion to dismiss for lack of subject matter jurisdiction."); *VT Investors v. R & D Funding Corp.*, 733 F. Supp. 823, 825, 827 (D.N.J. 1990) (analyzing an amended complaint that "alleged inapplicable sections of the securities laws, misperceived many of the security laws and failed to properly allege the jurisdiction of the Court" in the context of the Rule 12(b)(6) motion because "legal insufficiency

11

is not the standard applicable to a motion to dismiss for lack of subject matter jurisdiction"); *cf. Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *1 n.5, *8 (S.D.N.Y. Nov. 19, 2013) (declining to review complaint containing RICO claim under Rule 12(b)(1) because the claim was "not 'so insubstantial, implausible, or otherwise completely devoid of merit as not to involve a federal controversy'" and instead dismissing claim under Rule 12(b)(6) because the plaintiffs failed to allege any predicate act or pattern of racketeering activity (quoting *IUE AFL-CIO Pension Fund*, 9 F.3d at 1056)).

The allegations here are brought under specific provisions of the Exchange Act, and Plaintiffs have articulated a theory that is arguably cognizable under Rule 10b-5 and Section 9(a)(4).  Accordingly, the Court cannot find that these allegations are not colorable.

Defendant's motion to dismiss for lack of subject matter jurisdiction is DENIED.

### Dismissal for Failure to State a Claim

The Second Circuit has made clear that a court may dismiss an action *sua sponte* for failure to state a claim "so long as the plaintiff is given notice of the grounds for dismissal and an opportunity to be heard."  *Wisoff v. City of Schenectady*, --- F. App'x ----, 2014 WL 2219186, at *1 n.2 (2d Cir. May 30, 2014) (dismissing a claim against the City of Schenectady for failure to state a claim where the City moved to dismiss under Rule 12(b)(1), not 12(b)(6)).  Here, while Defendant has challenged the SAC on the basis of subject matter jurisdiction, its argument is largely premised on the failure of the SAC to state a claim.  *See* Def. Mem. L. 5-10.  Likewise, Plaintiffs have responded on the merits.  Indeed, in their opposition, Plaintiffs set forth and apply the standards for *both* Rule 12(b)(1) and Rule 12(b)(6).  *See* Pls. Opp. Mem. L. 5, 6.[6]  Thus,

---

[6] As Plaintiffs themselves state in opposition to the instant motion:

Plaintiffs were on notice that the SAC could be examined on the merits and responded accordingly.  Therefore, the Court will consider whether to dismiss the action for failure to state a claim.  *Cf. Wisoff*, 2014 WL 2219186, at *1 n.2 (noting that the plaintiff "had the required notice and opportunity to be heard" because the defendant's motion "was entirely premised on [the plaintiff's] failure to allege the existence of a municipal policy, practice, or custom that caused the alleged violation of his constitutional rights"); *see also First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 580, 81 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004) (finding that plaintiffs had "ample notice and availed themselves of the opportunity" to litigate the merits of the federal claims where they devoted a significant portion of their papers to Rule 9(b) and 12(b)(6) arguments, "apparently assuming that the Court would adjudicate these questions despite [defendant's] failure to move for dismissal").

### Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch*, 699 F.3d at 145; *see also, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  However, the Court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a motion to dismiss, a complaint must contain sufficient

---

In applying the forgoing legal principles the review in this case turns on whether the merits of the claim as guided by Fed. R. Civ. P.  12(b)6 applications and whether Plaintiffs' SAC states a cause of action under the 10(b) and 10b-5, and not whether the Court has the subject matter jurisdiction over the [case] with the Court accepting the claims of the complaint as true and giving all reasonable inferences to Plaintiffs.

Pls. Opp. Mem. L. 7.

factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### Heightened Pleading Standard under Rule 9(b) and the PSLRA

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'" (quoting Fed. R. Civ. P. 9(b))).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v.*

14

*Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, No. 13 Civ. 4596 (KBF), 2014 WL 1569500, at *9 (S.D.N.Y. Apr. 18, 2014) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

### Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b–5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or to omit[s] to state a material fact ... in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura Pharms.*, 544 U.S. at 341–42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit*, 264 F.3d at 138.

### 1.  *Reliance*

Defendant argues that the SAC must be dismissed because Plaintiffs have not pleaded and cannot plead reliance.  Def. Mem. L. 7.  There are two ways in which a plaintiff may plead reliance in connection with a claim under Rule 10b-5.  First, the plaintiff may allege that he "directly relied on defendants' misrepresentations."  *In re AES Corp. Sec. Litig.*, 849 F. Supp. 907, 909 (S.D.N.Y. 1994).  A plaintiff can demonstrate direct reliance "by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2181 (2011).  Second, the plaintiff "may allege that [he] relied on the integrity of the market, i.e., the 'fraud on the market' theory."  *In re AES Corp. Sec. Litig.*, 849 F. Supp. at 909-10 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).  "The fraud on the market theory is based on the premise that 'an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.'"  *Id.* at 910 (quoting *Basic*, 485 U.S. at 247).

Plaintiffs contend that they have successfully pleaded reliance through the fraud on the market theory.  Pls. Opp. Mem. L. 11.  Plaintiffs' theory fails for two reasons.  First, it fails because they cannot claim that *they* relied on the integrity of the market.  Their entire case is

based on the falsity of Doe's statements, and that, because the statements related to them, they

knew the statements to be false.  *See* SAC ¶¶ 10, 43, 46, 51, 88.  Because Plaintiffs acknowledge

that they themselves did not rely on the false statements, they argue that it was "other investors"

who were caused to sell their shares.  Pls. Opp. Mem. L. 14.  Despite claiming that this theory of

reliance is "universally accepted by the courts," *id.*, they cite not one court in support of this

novel application of the reliance requirement.  Indeed, the case law is to the contrary.  *See*

*Tiberius Capital, LLC v. PetroSearch Energy Corp.*, No. 09 Civ. 10270 (GBD), 2011 WL

1334839, at *6 (S.D.N.Y. Mar. 31, 2011), *aff'd*, 485 F. App'x 490 (2d Cir. 2012) (stating that

plaintiff could not establish reliance through the fraud on the market presumption because it

"affirmatively disbelieved" defendants' misrepresentations at the time it sold its shares).

      Second, Plaintiffs' theory of reliance fails because they do not allege that the Over-the-

Counter Bulletin Board ("OTCBB") is an efficient market.[7]  To rely on the fraud on the market

doctrine, a plaintiff must plead that the market in which he purchased his shares was efficient.

*See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 306 (S.D.N.Y. 2009)

("[W]here a plaintiff does not plead that the market in which he purchased his shares was

efficient, he cannot rely on the 'fraud-on-the-market presumption' of reliance, and must

specifically allege [direct] reliance."); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303

(S.D.N.Y. 2005) ("To obtain the benefit of this presumption, plaintiffs first must allege that the

relevant market was open and developed or, in other words, efficient."); *Dodona I, LLC v.*

*Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 650-51 (S.D.N.Y. 2012) (stating that plaintiff must

---

[7] The Over-the-Counter Bulletin Board is an electronic trading service operated by the Financial Industry Regulatory Authority that transmits real-time information of over-the-counter securities.  *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 485 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012); *H-Quotient, Inc. v. Knight Trading Grp.*, No. 03 Civ. 5889 (DAB), 2005 WL 323750, at *1 (S.D.N.Y. Feb. 9, 2005).

allege reliance on an assumption of an efficient market free of manipulation in order to state a claim for market manipulation through the fraud on the market doctrine).

In particular, Plaintiffs rely on *S.E.C. v. Ficeto*, 839 F. Supp. 2d 1101 (C.D. Cal. 2011), for the argument that the fraud on the market theory of reliance should apply to CodeSmart, an OTCBB stock.  In *Ficeto*, the court stated that "the Supreme Court [in *Morrison*][8] did not purport to overturn the universally accepted principle that § 10(b) applies with equal force to market manipulation on national exchanges and the domestic over-the-counter market."  *Id.* at 1112.  Despite this broad statement, however, the court in *Ficeto* intended this principle to apply only to the question of whether Section 10(b) extends to foreign defendants who purchase or sell securities on the domestic over the counter markets.  *Id.*  Indeed, as Defendant notes, the court in *Ficeto* does not even mention reliance.  Def. Reply Mem. L. 3 n.1.[9]

---

[8] In *Morrison*, the Court held, *inter alia*, that Section 10(b) does not provide a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. 561 U.S. at 247.

[9] Plaintiffs' reliance on *Ficeto* is unavailing because this court has previously concluded that the fraud on the market doctrine does not apply to OTCBB stocks.  In *Alki Partners*, the court stated that a Section 10(b) claim relating to an OTCBB stock's losses "must fail" because the plaintiffs could not claim reliance on an assumption of an efficient market free of manipulation.  769 F. Supp. 2d at 493.  The court noted that "while 'the NASDAQ is recognized as maintaining an efficient market . . . the Court is unaware of any court holding that the OTCBB . . . meet[s] this same standard.'"  *Id.* (quoting *Burke v. China Aviation Oil (Sing.) Corp.*, 421 F. Supp. 2d 649, 653 (S.D.N.Y. 2005)); *see also In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138 (D.N.J. 1984) ("The trading on the over-the-counter market may not constitute an 'active and substantial' market necessary to apply the fraud-on-the-market theory."); *Epstein v. Am. Reserve Corp.*, No. 79 C 4767, 1988 WL 40500, at *5 (N.D. Ill. Apr. 21, 1988) ("Although the issue was not briefed, we believe that the over-the-counter market is incapable of meeting the Supreme Court test [from *Basic*]" (citing *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. at 138)); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (concluding that "the presumption of market efficiency, which would support an application of the fraud on the market theory, does not apply [to the OTCBB stock at issue]").

However, courts in this Circuit have often found the question of whether a market is efficient to be a question of fact and therefore not meant to be answered on a motion to dismiss.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008) (stating that the question of whether relevant markets were efficient is a question of fact to be resolved at trial); *In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992) (per curiam) ("Whether in fact Laser Arms (whose stock was traded in the over-the-counter market) traded in an efficient market is a question of fact.  Therefore, resolution of that issue must await

The SAC does not allege that the OTCBB market for CodeSmart stock was open and efficient.  Accordingly, Plaintiffs have failed to properly plead reliance under the fraud on the market doctrine.

### 2.   *Loss Causation*

Defendant further argues that the SAC should be dismissed because Plaintiffs have not pleaded, and cannot plead, loss causation.  "Loss causation is the requirement that a plaintiff allege that the 'defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.'"  *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 305 (quoting *Dura Pharms.*, 544 U.S. at 346).  The burden of loss causation rests on the plaintiff, and requires that the plaintiff show that the misstatements were the reason the transaction turned out to be a losing one.  15 U.S.C. § 78u-4(b)(4)); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994), *cert. denied*, 513 U.S. 1079 (1995).  "To plead loss causation, the complaint[] must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005).  The Second Circuit has "repeatedly analogized" the concept of loss causation to proximate cause, as loss causation requires that the damages suffered by a plaintiff be a foreseeable consequence of any misrepresentation or material omission.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  "A loss is foreseeable if it is 'within the zone of risk *concealed* by

---

presentation of further proof at trial.").  Accordingly, the Court will not grant Defendant's motion to dismiss on the basis that the OTCBB cannot meet the standard for an efficient market as a matter of law.

the misrepresentations and omissions alleged by the disappointed investor.'"  *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 685 (S.D.N.Y. 2012) (quoting *Lentell*, 396 F.3d at 173).  In other words, to establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.  *Lentell*, 396 F.3d at 173; *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (stating that loss causation requires the plaintiff allege that the *subject* of the fraudulent or omission was the cause of the actual loss suffered); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 189 (2d Cir. 2001) (recognizing that loss causation is satisfied by allegations that the defendant "disguised the very risk to which [the plaintiff] fell victim").

The Second Circuit has explained loss causation as follows:

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

*Castellano*, 257 F.3d at 188 (quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 235 (2d Cir. 2000) (Winter, J., dissenting)); *cf. Suez Equity Investors*, 250 F.3d at 93, 98 (finding loss causation properly pleaded through investors' allegations that the defendant company provided them with report that omitted negative information about the company's founder, principal executive, and controlling shareholder, and that it was "entirely foreseeable" at the time of the misrepresentation that the company would fail as a result of the founder's lack of skill); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 364 (S.D.N.Y. 2011) (stating that losses from misappropriation of investment funds in Bernard Madoff's Ponzi scheme were "plainly within

the zone of risk" concealed by investment advisor firm's failure to advise its clients that it would not perform due diligence on the clients' investments).

"Loss causation 'is typically shown by the reaction of the market to a corrective disclosure which reveals a prior misleading statement,'[10] but 'may also be shown by the materialization of risk method, whereby a concealed risk . . . comes to light in a series of revealing events that negatively affect stock price over time.'" *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011) (quoting *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (internal quotation marks omitted)); *see also Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008) ("A concealed risk can lead to a decline in stock price either because a corrective disclosure reveals the falsity of the misrepresentations or omissions, or because the risk which was concealed materializes and causes the price decline.").

Plaintiffs do not rely on the corrective disclosure theory, and concede that there was no corrective action taken with respect to the misstatement at issue.  Pls. Opp. Mem. L. 15. According to Plaintiffs, Defendants intentionally developed and published defamatory statements on InvestorsHub, causing other investors to sell their CodeSmart shares "thereby plunging the price of the stock and causing the loss to the Plaintiffs."  *Id.*  Plaintiffs contend that loss causation is satisfied here because the loss here was foreseeable and the misrepresentation was

---

[10] In order to plead that "the market reacted negatively to a corrective disclosure," the corrective disclosure in question must "reveal to the market the falsity of the prior recommendations."  *Lentell*, 396 F.3d at 175, 175 n.4. "Under this method, a plaintiff must tie his loss to the dissipation of an inflated (or deflated) price upon a disclosing event that reveals the false information to the market."  *Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011).

Plaintiffs' entire lawsuit here is based on the premise that Defendant Doe disseminated a false rumor about Plaintiff Salvani that caused the price of CodeSmart stock to experience a steep decline.  According to Plaintiffs' theory then, it was a false statement—and not a corrective disclosure—that caused CodeSmart's stock price to drop.

"within a zone of risk concealed." *Id.*[11]   Accordingly, in order for Plaintiffs to satisfy the Second

Circuit's loss causation requirement, they must do so through the materialization of risk theory.[12]

In order to successfully plead loss causation under the materialization of risk method, the

"new information" revealed must have been "previously concealed and fall within the 'zone of

risk' concealed so that the events were foreseeable consequences of the fraud."   *In re Vivendi*

*Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d at 555 (internal citation omitted).[13]   The

materialization of risk theory thus requires a direct connection between the risk that is hidden

from investors and the subsequent loss suffered by those investors.   For example, in *Parmalat*,

the court found that plaintiffs successfully pleaded loss causation under the materialization of

risk method by alleging that auditors misrepresented the accuracy and completeness of

Parmalat's financial statements when, in fact, they significantly understated the company's debt

and overstated its revenue and net assets.   375 F. Supp. 2d at 306.   The court found Parmalat's

"massive undisclosed debt" to be a concealed risk which subsequently materialized when the

company suffered a liquidity crisis and became unable to pay bonds as they came due.   *Id.* at

---

[11] In particular, Plaintiffs argue that "the banner heading and content specific boards [on InvestorsHub] are within the zone of risk created where the statements were material and were the proximate cause of the Plaintiffs' loss." Pls. Opp. Mem. L. 15-16.

[12] *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017 (DAB), 2013 WL 297954, at *10 (S.D.N.Y. Jan. 18, 2013) (stating that a plaintiff may establish loss causation through either a corrective disclosure or a materialization of a concealed risk); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (same).

[13] *See also In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010) (observing that where courts have found loss causation to be satisfied through the materialization of a risk, the materializations that led to losses "were sudden and caused the stock value to plummet abruptly").

307.  After Parmalat announced that it would have to delay repayment on certain bonds, the price of Parmalat stock dropped sharply.  *Id.*[14]

By contrast, in *Lentell*, the court affirmed the dismissal of a Rule 10b-5 claim based on the plaintiffs' failure to plead loss causation under a materialization of risk theory.  396 F.3d at 175.  There, the plaintiffs alleged that a brokerage and its analyst issued false and misleading reports recommending that investors purchase stock of companies even though the defendants did not believe the purchases to be good investments.  *Id.* at 164.  The court ruled that the plaintiffs did not satisfy loss causation under the materialization of risk approach because there was no allegation that the brokerage misstated or omitted the risks that ultimately led to the plaintiffs' losses.  *Id.* at 175 ("There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations and no allegation that Merrill misstated or omitted the risks that did lead to the loss.  This is fatal under Second Circuit precedent.").

Here, Plaintiffs have not identified a concealed risk that proximately caused a decline in the value of the stock when revealed.  Instead, Plaintiffs claim that it was the false statement itself--not a risk previously concealed or a subsequent revealing event--that led to the decline in CodeSmart's stock price.  Accordingly, Plaintiffs have failed to plead loss causation under the materialization of risk theory.

---

[14] *Cf. Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700 (PKC), 2012 WL 3957916, at *17 (S.D.N.Y. Sept. 10, 2012) (finding loss causation adequately pleaded through materialization of risk theory where an investment management fund's coverage report revealed apparent discrepancies in defendant company's filings with United States and Chinese regulatory authorities, causing an 18% decline in defendant's stock price on date of report's release); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 624 (S.D.N.Y. 2008) (ruling that plaintiff successfully pleaded loss causation against investment fund that stated in, *inter alia*, an offering memorandum its goal of achieving a targeted $200 million capitalization and portfolio diversification; the concealed risk that the investment fund was undercapitalized and unable to follow through on its investment strategy materialized through fund partner's letter and fund's financial statement disclosing that it had begun operations with only $40,750,000).

For the reasons stated above, Plaintiffs have not sufficiently pleaded reliance or loss causation.  The SAC therefore fails to state a claim under Section 10(b).

### Section 9(a)(4)

As noted above, Section 9(a)(4) closely parallels Section 10(b).  *See Panfil*, 768 F. Supp. at 59.  Section 9(a)(4) makes it unlawful for any person selling or offering for sale or purchasing or offering to purchase a security:

> to make, regarding any security registered on a national securities exchange, [or] any security not so registered, . . . for the purpose of inducing the purchase or sale of such security, . . . which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading.

15 U.S.C. § 78i(a)(4).  A claim under Section 9(a)(4) "requires a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1161-62 (5th Cir. 1982) (footnotes omitted), *vacated on other grounds*, 460 U.S. 1007 (1983), *on remand*, 718 F.2d 725, 728 (5th Cir. 1983); *see also OpenGate Capital Group LLC v. Thermo Fisher Scientific Inc.*, No. 13-1475-GMS, 2014 WL 3367675, at *9 (D. Del. Jul. 8, 2014) (finding, based on the "persuasive guidance from district courts in this Circuit and other Circuit courts," that Section 9(a)(4) requires a plaintiff plead the following elements: (1) the defendant's material misrepresentation; (2) scienter; (3) intent to induce reliance; (4) the plaintiff's reliance; and the (5) plaintiff's act in detrimental reliance).  And at least one court in this Circuit has noted that Section 9(a)(4) creates a higher burden of proof than Section 10(b).  *See Panfil*, 768 F. Supp. at 59 (quoting *Chemetron*, 682 F.2d at 1162).

Because the Court has already concluded that Plaintiffs failed to plead reliance under either the direct reliance approach or the fraud on the market approach, Plaintiffs' Section 9(a)(4) claim necessarily fails.  *Cf. Panfil*, 768 F. Supp. at 59 ("Given the parallel requirements of these statutes, plaintiff's failure to show the omission of a material fact under rule 10b-5 . . . also defeats his claims under § 9(a)(4).").  Accordingly, Plaintiffs' claim under Section 9(a)(4) must be dismissed.

*Supplemental Jurisdiction Under 28 U.S.C. § 1367*

Plaintiffs' remaining claims are common law tort claims.  Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having dismissed Plaintiffs' sole federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  28 U.S.C. § 1367(c)(3).

Therefore, Plaintiffs' defamation, libel, tortious interference with contract, aiding and abetting, intentional infliction of emotional distress, and permanent injunction claims are DISMISSED without prejudice.[15]

---

[15] Because the Court has otherwise dismissed Plaintiffs' claims, it need not consider Defendant's argument that InvestorsHub is immune from liability under the Communications Decency Act.  *See* Def. Mem. L. 4 n.3.

**III.    Conclusion**

For the reasons set forth above, Defendant's motion to dismiss pursuant to Rule 12(b)(1)

is DENIED, and the Court dismisses the Second Amended Complaint *sua sponte* pursuant to

Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The Clerk of the

Court is respectfully directed to terminate the motion, Doc. 18, and close the case.


SO ORDERED.

Dated:      September 23, 2014
            New York, New York

_____
Edgardo Ramos, U.S.D.J.